UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARY RIHM and RECHO ROWELL,        )
                Plaintiffs,        )
                      )
     vs.        )
                      )        1:12-cv-01474-RLY-TAB
HANCOCK COUNTY PUBLIC        )
LIBRARY, et al.        )
              Defendants.        )
                      )

**ENTRY ON DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, Mary Rihm and Recho Rowell, filed this civil action against the

Hancock County Public Library ("Library"), and Dianne Osborne and Jean Medley,

individually and in their official capacities, among others, alleging violations of their

constitutional and state rights.  The Library and Osborne (together, "Defendants"), filed a

motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  For

the reasons set forth below, the court now **GRANTS IN PART** and **DENIES IN PART**

the motion.

## I.        Background

The following facts are taken from Plaintiffs' Complaint and presumed to be true

for purposes of this motion.  Rihm is a Caucasian female who began employment at the

Library in August 2008.  (Compl. ¶¶ 10-11).  Rowell is an African-American male who

---

[1] Medley is no longer employed by the Library and thus is not represented by the same counsel
as the Library and Osborne.  Medley, therefore, is not a party to this motion.

has been in an intimate relationship with Rihm since prior to Rihm's employment at the Library.  (*Id.* at ¶¶ 10-11).  Rihm and Rowell have two children together.  (*Id.* at ¶ 11).

The Library employed Medley as Circulation Manager and Osborne as Director of the Library.  (*Id*. at ¶ 5).  Medley was Rihm's immediate supervisor.  (*Id.* at ¶ 12).  Medley, an African-American female, was married to an African-American male.  (*Id.*).  Medley and Rihm had a friendly relationship in both work and social settings prior to December 2008.  (*Id.* at ¶ 13).

In December 2008, Medley became aware of Rihm's and Rowell's intimate relationship, which led Medley to criticize Rihm's job performance for the first time.  (*Id.* at ¶¶ 14-15).  For example, in the presence of Library staff, Medley verbally attacked Rihm regarding Rihm's first pregnancy and referred to Rihm as "mentally slow" and "need[ing] help."  (*Id.* at ¶¶ 18-19).  Similarly, Medley unfairly criticized Rihm for work performance issues by: (1) prohibiting Rihm from using the telephone for personal calls despite other employees not being limited; (2) reprimanding Rihm for the "way [she] sound[ed] on the telephone"; and (3) reprimanding Rihm for "discussing [her] personal life" at work even though other employees were not similarly criticized and they had initiated the discussions.  (*Id.* at ¶¶ 21-23).  In addition, Rihm alleges that Medley condoned and abetted additional discriminatory behavior toward Rihm by Senior Librarians Casey Scholl and Amanda Roeger.  (*Id.* at ¶ 20).  Despite Medley's repeated complaints about Rihm's work performance, Rihm never received any documentation of her alleged performance deficiencies until October 2010.  (*Id*. at ¶ 24).  In contrast, Rihm complained of this discriminatory treatment throughout her employment.  (*Id*. at ¶ 25).

Moreover, Rihm alleges that Medley criticized her for her relationship with Rowell, stating she disapproved because "white women should not date African American men." (*Id*. at ¶ 16). To that end, Medley would "roll her eyes and express her disapproval through body language" whenever she saw Rihm speaking with Rowell at the Library. (*Id*. at ¶ 17).

On October 9, 2010, Rowell visited the Library on personal business. (*Id.* at ¶ 27). Scholl and Roeger observed Rowell in the Library lobby, but Rowell did not communicate with them in any way. (*Id*. at ¶¶ 29-30). The next day, Medley called Rihm into her office to inform Rihm that Rowell had allegedly "intimidated" other, unidentified individuals. (*Id*. at ¶ 31). As a result, Medley informed Rihm that Rowell was no longer allowed to enter the Library when Rihm was working. (*Id*.). Other employees did not have any family visitor restrictions. (*Id.* at ¶ 32).

On October 15, 2010, Osborne sent several unnamed police officers to deliver written notice to Rowell, at his home address, that his rights to be on the premises of the Library were terminated, effective immediately. (*Id.* at ¶ 35). This ban stemmed from allegedly being "disruptive and intimidating to employees and operations of [the Library]." (*Id.*).

On October 26, 2010, the Library suspended Rihm without pay for three days for engaging in an allegedly disrespectful conversation with Osborne along with "numerous complaints by other Circulation staff of a hostile work environment caused by [Rowell's] disrespect and treatment of other staff." (*Id.* at ¶ 39). On November 11, 2010, the

3

Library terminated Rihm for allegedly "failing to follow orders and unprofessional behavior." (*Id.* at ¶ 40).

Based on the above facts, Plaintiffs brought various constitutional claims under 42 U.S.C. § 1983 ("Section 1983"), along with claims for intentional infliction of emotional distress ("IIED"), against the Library, and Osborne and Medley, in their official and individual capacities. (Compl. Counts One, Two, Five, and Six). The Library and Osborne now move to dismiss all claims against them.

## II.    Standard

Federal Rule of Civil Procedure 12(b)(6) permits the district court to dismiss a complaint for failure to state a claim for which relief can be granted. The purpose of the motion is to test the legal sufficiency of the complaint, not to resolve the case on the merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding this motion, the court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted).

A complaint need only provide "a short and plain statement of the claim" showing that the plaintiff is entitled to relief and be sufficient to provide the defendant with fair notice of the claim and its basis. *Id.* Although "detailed factual allegations" are not

4

required, the plaintiff must allege facts that raise the possibility of relief above the "speculative level." *Twombly*, 550 U.S. at 555; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject matter of the case to present a story that holds together."). As a result, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### III.   Discussion

#### A.   Constitutional Claims

Plaintiffs allege a litany of constitutional claims against Defendants, including claims for freedom of association, due process, and equal protection, as guaranteed by the First, Fifth, and Fourteenth Amendments.

##### 1.   Claims Against Osborne in her Official Capacity

Plaintiffs' complaint alleges a deprivation of their constitutional rights by the "Library Defendants." The "Library Defendants" include the Library; Osborne, individually, and in her official capacity as Director of the Library; and Medley, individually, and in her official capacity as Circulation Manager of the Library.

The "official capacity" claims are, as Defendants have argued, redundant, as a suit against a public employee in her official capacity is equivalent to a suit against the governmental entity that she serves. *Sakelaris v. Danikolas*, No. 2:05-cv-158, 2007 WL 917376, at *3 (N.D. Ind. Mar. 23, 2007); *see also Collins v. Meike*, 52 F. App'x 835, 836 (7th Cir. 2002) (upholding dismissal of school's principal in her official capacity as "redundant" because the School Board was also a party); *Bryson v. Chicago State Univ.*,

5

96 F.3d 912, 917 (7th Cir. 1996) (dismissing claim against provost in his official capacity because it was identical to the action against the university, which was the proper defendant); *Gillespie v. City of Indianapolis*, 13 F. Supp. 2d 811, 816 (S.D. Ind. 1998) *aff'd*, 185 F.3d 693 (7th Cir. 1999) (dismissing chief of police in his official capacity because the only viable defendant in the action was the city).  Since the Library is a named Defendant here, a suit against Osborne in her official capacity is redundant, and the court accordingly dismisses the claims against Osborne in her official capacity.[2]

### 2.  Claims Against Library

Next, the court turns to Plaintiffs' constitutional claims against the Library. Section 1983 does not allow for municipal liability against entities such as the Library based only on a theory of respondeat superior.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978); Ind. Code § 36-12-2-2(a) ("A Class 1 public library is a municipal corporation . . . .").  Instead, "it is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983."  *Id.* at 694.  Thus, to establish liability against a municipality under Section 1983, a plaintiff must allege that his injury was caused by an official policy, custom, or practice.  *Id.*  A policy, custom, or practice may be demonstrated by:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by

---

[2] Though claims against Medley in her official capacity would meet this same result, the court will only rule on the issues before the court.

written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal quotations and citation omitted).

Here, Plaintiffs do not argue – other than boilerplate, conclusory allegations – that the Library had an express policy that led to a violation of Rihm's or Rowell's rights. (*See* Compl. ¶¶ 43, 48).  Nor do they allege that a widespread practice or pervasive pattern of such conduct existed.  Instead, Plaintiffs argue that Osborne and Medley had final policymaking authority with respect to Rihm's discipline, suspension, and termination as well as Rowell's denial of access to the Library.  Particularly, Plaintiffs allege that "Medley and Osborne were supervisory and/or managerial employees of the Library, exercising final decision-making authority . . . and were exercising that authority conferred upon them by the Library."  (Compl. ¶¶ 43, 48).

The status as a policymaker for Section 1983 purposes is conferred by state or local law.  *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999).  In particular, courts should "identify those officials with final policymaking authority by reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law."  *Killinger v. Johnson*, 389 F.3d 765, 771-72 (7th Cir. 2004) (citation omitted).  Here, under Indiana law, the Library Board has final policymaking authority.  *See* Ind. Code 36-12-3-3 ("The library board shall govern and set policy for all the affairs of the public library").

Plaintiffs fail to direct the court to any Indiana statute or other ordinance suggesting that either Osborne or Medley, by virtue of their respective positions, had the authority to establish official policy on behalf of the Library.

Plaintiffs nevertheless contend that Osborne and Medley had final policymaking authority for the following reasons: (1) they committed the unlawful acts that are the subject of the Complaint; (2) their decisions were not subject to a higher authority; and (3) their actions "may fairly be said to represent official policy."  In the absence of an Indiana statute conferring such authority to Osborne, as Library Director, and Medley, as Circulation Manager, Osborne and Medley may be deemed a final policymaker only if the Library Board either delegated final policymaking authority to them, or ratified their decisions.  *Kujawski*, 183 F.3d at 737 (stating "[f]inal policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority").

With respect to Plaintiffs' first contention, the fact that Osborne and Medley are alleged to have committed the unlawful acts that are the subject of this lawsuit does not confer final policymaking authority to them for purposes of Section 1983 liability. "Misbehaving employees are responsible for their own conduct, [and] units of local government are responsible only for their policies rather than misconduct by their workers."  *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citation omitted). The Library cannot be sued on the basis of respondeat superior, so this argument fails.

With respect to Plaintiffs' second contention, the decisions allegedly not subject to higher authority are Osborne's decision to fire Rihm and ban Rowell.  This argument is

8

misplaced as "the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority.  There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (citing *Kujawski*, 183 F.3d at 739); *see also Venters v. City of Delphi*, 123 F.3d 956, 966 (7th Cir. 1997) (finding chief of police's power to "hire, fire, demote, and otherwise manage" his department was distinct from the power to make policy for the city).

Here, Plaintiffs fail to allege that the Library Board delegated such policymaking authority to Osborne.  Although the Complaint states that Medley and Osborne "were exercising that authority conferred upon them by the Library," this is a mere legal conclusion, devoid of any factual support; as such, the court is not required to accept it. *See McTigue*, 60 F.3d at 382-83 ("Boilerplate allegations of a municipal policy, entirely lacking in any factual support that a [municipal] policy does exist, are insufficient. . . . The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of section 1983 liability devoid of any well-pleaded facts") (citation omitted).

Moreover, with respect to Osborne's decision to ban Rowell, the "[a]uthority to make a final decision need not imply authority to establish rules."  *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992).  Indeed, "that a particular agent is the apex of a bureaucracy makes the decision 'final' but does not forge a link between 'finality' and 'policy.'"  *Id.* at 400.  Put another way,

9

> The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion . . . The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).  To that end, even if Osborne had unfettered power to ban citizens from the Library, this alone is distinct from the authority to make policy for the Library.  Thus, the fact that Osborne's decisions were not reviewed by a higher authority does not result in municipal liability for the Library.

Lastly, with respect to Plaintiffs' third contention, a difference exists between implementing pre-existing rules and possessing the responsibility for making law and setting policy.  *Rasche v. Village of Beecher,* 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma,* 957 F.2d at 401).  Indeed, the mere authority to implement pre-existing rules is not the authority to set policy.  *Killinger*, 389 F.3d at 771.  Again, Plaintiffs fail to allege that Osborne possessed the responsibility to make law or set policy.  In fact, Plaintiffs' allegations infer, if anything, that existing Library policies were enforced in an unfair manner against them, not that new policies were created.  Thus, Osborne's and Medley's actions cannot be considered as setting official policy for the Library.

Plaintiffs have not provided any basis to conclude, beyond their own bare allegations, that either Osborne (as Director) or Medley (as Circulation Manager) had final policymaking authority within the meaning of *Monell* and its progeny. [3]

---

[3] Plaintiffs argue that Osborne ratified Medley's actions.  Even assuming Osborne did ratify Medley's actions, this is inconsequential since Osborne herself is not deemed a final policymaker for purposes of *Monell* liability.  Nor have Plaintiffs alleged any alternative basis for Medley

Accordingly, Plaintiffs' constitutional claims against the Library (Counts One and Two) are dismissed.

### 3.  Claims against Osborne in her Individual Capacity

Plaintiffs allege that Osborne in her individual capacity "deprived and/or conspired to deprive Rihm of her federally protected rights of freedom of association and equal protection, as guaranteed by the First and Fourteenth Amendments to the United States Constitution[.]"  (Compl. ¶ 42).  Similarly, Plaintiffs allege that Osborne also "deprived and/or conspired to deprive Rowell of his federally protected rights of freedom of association, equal protection, and due process of law as guaranteed by the First, Fifth and Fourteenth Amendments to the United States Constitution[.]"  (*Id.* at ¶ 47).  The court now turns to these claims.

### a.  Equal Protection

To establish a prima facie case of discrimination under the equal protection clause, a plaintiff must show that: (1) he/she is a member of a protected class; (2) he/she is otherwise similarly situated to members of the unprotected class; and (3) he/she was treated differently from members of the unprotected class.  *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005).  Such claims also require proof of discriminatory intent.  *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000).

---

having final policymaking authority; thus, Medley is also not deemed a final policymaker for purposes of *Monell* liability.

### i.  Rihm

Plaintiffs have extensively documented instances of discriminatory animus on the part of Medley toward Rihm; however, allegations relating to Osborne's behavior are scarce.  In fact, only one factual allegation concerns Osborne's interaction with Rihm. This relates to Rihm being suspended for three days without pay "for engaging in an allegedly 'disrespectful' conversation with Osborne, and for 'numerous complaints by other Circulation staff of a hostile work environment caused by [Rowell's] disrespect and treatment of other staff.'"  (Compl. ¶ 39).  Rihm does not allege that other individuals outside her protected class were treated differently by Osborne.  That alone is fatal to her claim.[4]

Moreover, Plaintiffs fail to allege facts showing Osborne had any discriminatory intent.  Instead, Rihm's claim is built on a litany of inferences which were not alleged in the complaint and which, according to Rihm, reflect that Osborne ratified Medley's behavior.[5]  Particularly, Rihm argues that it is "reasonable to infer that the 'other

---

[4] The court assumes for purposes of this motion that Rihm is a member of a protected class even though she is Caucasian.  (Compl. ¶ 10).  Although equal protection claims are most typically brought by members of disfavored classes of citizens or by citizens attempting to enforce fundamental rights, "some courts have recognized that a plaintiff may state a discrimination claim under the equal protection clause of the Fourteenth Amendment or Title VII of the Civil Rights Act that is based on aiding and associating with people of a protected class."  *Barlass v. Carpenter*, No. 10-cv-454, 2010 WL 3521589, at *5 (W.D. Wis. Sept. 7, 2010) (citing cases from the Second, Sixth, and Eleventh Circuits).  The Seventh Circuit has not addressed whether discriminating against a person for association with a person of a protected class constitutes race discrimination, but for the purposes of this motion the court will assume Rihm is a member of a protected class because of the early stage of this case and because this issue was not addressed by the parties.  *See id.*

[5] Although the court may not consider matters outside the pleadings when deciding a motion to dismiss, it may consider any additional allegations in Plaintiffs' brief so long as those allegations

employees' whose discriminatory behavior Medley is alleged to have 'condoned and abetter [sic]' were either or [sic] a different race than Rihm, or were not involved in interracial relationships, or both."   Plaintiffs continue to surmise that it is "reasonable to infer that Rihm's complaints were made to Osborne," since it is unlikely Rihm would have complained to Medley regarding the actions by Medley.   And building on that inference, Plaintiffs argue that it is reasonable to conclude that Osborne did nothing about Rihm's complaints since they continued and ultimately led to her termination.   Based upon these unsupported inferences, Plaintiffs argue that a jury could conclude that Osborne ratified Medley's and other employees' behavior.

Just as the Complaint focuses almost centrally on Medley's actions, so too does Plaintiffs' argument.   Plaintiffs present no factual basis for Osborne's actions being discriminatory, but instead rely solely on speculation and conjecture.   Indeed, the only allegations concerning Osborne's actions – her suspension and subsequent termination of Rihm – were allegedly based on inappropriate and unprofessional conduct.   In other words, Rihm has not even alleged that Osborne's actions stemmed from a discriminatory motive.   This house of inferences cannot stand.   *See Angie's List, Inc. v. Ameritech Pub., Inc.*, No. 1:07-cv-1630, 2010 WL 2521722, at *2 n.2 (S.D. Ind. June 15, 2010) ("The allegations of a complaint must contain enough factual matter to plausibly suggest that each element of the claimed cause of action actually exists, not that the element's

are consistent with the complaint.  *Lang v. TCF Nat. Bank*, 249 F. App'x 464, 465 (7th Cir. 2007); *Help At Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 752-53 (7th Cir. 2001).  That said, "naked assertions devoid of further factual enhancement" will not suffice to successfully set forth a claim.  *Iqbal*, 556 U.S. at 678.

existence is possible, conceivable, or that facts exist that are merely consistent with the element's existence."). Rihm's equal protection claim against Osborne, therefore, must be dismissed.

### ii. Rowell

Rowell also brings an equal protection claim against Osborne. Rowell, an African-American, meets the first element of the equal protection analysis as a member of a protected class. Again, however, Rowell does not sufficiently plead that Osborne treated Rowell differently from members of an unprotected class or had a discriminatory motive. The only factual allegations as to Osborne's interaction with Rowell concern Osborne sending police officers to Rowell's home to deliver a notice which terminated Rowell's rights from visiting the Library due to "allegedly, 'disruptive and intimidating employees and operations of [the Library]'." (Compl. ¶ 35). Again, neither allegations of Osborne's discriminatory animus towards Rowell exist nor any comparisons to members of an unprotected class who were treated differently by Osborne. Instead, he relies solely on the possibility that this animus existed and discriminatory treatment resulted. Rowell's allegations are insufficient to withstand a motion to dismiss. *See Martin v. Indiana*, No. 1:12-cv-69, 2013 WL 1332165, at *5 (N.D. Ind. Mar. 29, 2013) (stating "a complaint which makes no factual allegations against a defendant does not give that defendant fair notice of what the claim is; neither does it suggest any plausible basis for granting relief"). Consequently, his equal protection claim fails.

### b.  Freedom of Association

Plaintiffs allege that Osborne has deprived them of their federally protected rights of freedom of association under the First Amendment by disciplining and terminating Rihm due to her relationship with Rowell, and for the same reason banning Rowell from the Library premises.  (Compl. ¶¶ 42, 47).

As an initial matter, the court must first determine whether Plaintiffs' freedom of association claims fall under the First Amendment, as Plaintiffs argue, or instead fall under the Fourteenth Amendment's Due Process Clause, as Osborne maintains.  The Supreme Court has recognized the constitutional right to enter into and carry on certain intimate relationships.  *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).  The Court further discussed how cases concerning this "freedom of association" have taken "two distinct senses."  *Id.* at 617.  In one category of cases, the Court "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Id.* at 618.   In the other line of cases, the Court determined that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."  *Id.* at 617-18.  As a result, such intimate human relationships are protected as a fundamental element of personal liberty.  *Id.* at 618.  The Seventh Circuit later interpreted this protection as falling "under the Due Process Clause."  *Christensen v. Cnty. of Boone, IL*, 483 F.3d 454, 463 (7th Cir. 2007).

Plaintiffs have not alleged that their relationship was entered into for the purpose of "speech, assembly, petition for the redress of grievances, [or] the exercise of religion." Nevertheless, they maintain their freedom of association claims should be evaluated under the First Amendment despite the Seventh Circuit's explicit finding that long-term, unmarried relationships should be evaluated under the Due Process Clause as a liberty interest.  *Christensen*, 483 F.3d at 463.

First, Plaintiffs argue that the additional language in *Christensen* concerning the Due Process Clause is mere dicta.  Though the *Roberts* Court did not mention the Due Process Clause in its opinion, the Seventh Circuit interpreted the phrase "protection as a fundamental element of personal liberty" as requiring analysis under the Due Process Clause.  *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . .").  Thus, the Seventh Circuit did not alter *Roberts* but merely interpreted its analysis.  Indeed, district courts in the Seventh Circuit have evaluated claims similar to the ones at issue here under the Due Process Clause.  *See e.g., Wiswell v. Abbott*, No. 08-3093, 2008 WL 5100471, at *1 (C.D. Ill. Dec. 1, 2008) (finding actions by Assistant States Attorney to interfere with plaintiff's intimate association with her boyfriend was a liberty interest protected by the Fourteenth Amendment due process claims); *Null v. Gardner*, No. 09-cv-1065, 2009 WL 2928144, at *3 (C.D. Ill. Sept. 9, 2009) (finding claim that plaintiff

16

fired from position as deputy clerk because of intimate relationship with man is analyzed as a liberty interest under the Due Process Clause).

Next, Plaintiffs attempt to distinguish the Seventh Circuit's decision on the grounds that plaintiffs there brought a freedom of association claim under the Due Process Clause in contrast to Plaintiffs here who invoke the First Amendment as the basis for their claims.  By extension, Plaintiffs argue that *Roberts* did not suggest that intimate associations may *only* be addressed under the Due Process Clause.  Lacking in Plaintiffs' argument, though, is a single case where a court has analyzed their type of relationship under the First Amendment or any avenue other than the Due Process Clause.[6] Accordingly, *Christensen* remains precedent for this court to evaluate these claims under the Due Process Clause.

The court now turns to whether Plaintiffs stated claims under this standard.  In evaluating whether Plaintiffs have stated a viable claim under the Due Process Clause of the Fourteenth Amendment, the court examines, among other things, whether the alleged conduct by Osborne "shocks the conscience."  *Christensen*, 483 F.3d at 464.  This standard applies to only the most egregious conduct as it "works to distinguish the due process guarantee from traditional standards of tort liability, so that the Fourteenth Amendment does not become a 'font of tort law.'"  *Id*. at 462 n. 2.  For example, conduct was first announced to shock the conscience in *Rochin v. People of California*, where

---

[6] Though Plaintiffs cite to the Supreme Court's brief mention of the First Amendment protecting family relationships which presuppose deep attachments and commitments, the Court merely referenced this in a broad overview of the *Roberts* opinion and did not actually analyze under the First Amendment an intimate relationship between two parties as present here.  *See Board of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).

police officers broke into a suspect's home without probable cause or exigent

circumstances, assaulted the suspect, falsely arrested him, and pumped his stomach to

obtain evidence. 342 U.S. 165, 172 (1952). On the other hand, allegations that a Deputy

intentionally stalked and harassed plaintiffs specifically to interfere with their intimate

relationship were deemed not to meet the shocks the conscience standard even though the

Deputy acted disreputably and shamefully. *Christensen*, 483 F.3d at 465.

Here, as noted above, allegations concerning Osborne's behavior and alleged

discriminatory animus are scarce. Even when construing the complaint in the most

favorable way towards the Plaintiff, Osborne's conduct does not shock the conscience.

According to the Complaint, Osborne disciplined and ultimately terminated Rihm for

unprofessional behavior; Osborne banned Rowell from the Library's premises to protect

her employees and other Library patrons. Though Plaintiffs argue that these reasons were

mere pretext for the interracial relationship between them, they have failed to allege

Osborne acted for any other reason than to benefit the Library, its employees, and its

patrons. Even assuming Osborne acted with discriminatory intent, which again the

Plaintiffs have not sufficiently alleged, this conduct likely would not be sufficient to meet

this high standard. Accordingly, Plaintiffs' claims for freedom of association are

dismissed.

### c. Rowell's Due Process Claim

Rowell alleges that Osborne deprived him of his federally protected rights of due

process of law as guaranteed by the Fifth Amendment. (Compl. ¶ 47). For Rowell to

succeed on a substantive due process claim under the Fifth Amendment, he must show

action that is so egregious that it "shocks the conscience." *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (stating "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense").  As discussed in Plaintiffs' claim for freedom of association, Osborne's conduct does not reach this level, particularly in regards to her treatment of Rowell.  The only interaction between Osborne and Rowell involved Osborne sending a written notice to Rowell's home which terminated his rights to be on the Library's premises for allegedly disrupting and intimidating Library employees.  (Compl. ¶ 35).  This is no where near the "conscience shocking" behavior required to plead a claim.

Plaintiffs do not dispute the standard which should be applied, but instead argue that Osborne's decision was based on Rowell's relationship with Rihm and Rowell's race, which would ultimately shock the conscience for "the Director of a public library, in the Twenty-first Century, [to] deny a black citizen access to the library because of his race, and his relationship with a white woman."  (Pls.' Resp. 8-9).  This argument is based solely on a legal conclusion with no factual basis.  Indeed, no factual allegations impute any discriminatory animus to Osborne; instead, Plaintiffs rely on pure speculation that Osborne's decision was motivated by Rowell's relationship with Rihm or his race. This is not sufficient to state a claim, so Rowell's due process claim must be dismissed. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

Additionally, Plaintiffs present three other arguments in their response to Osborne's argument for dismissing Rowell's due process claim: (1) Rowell has a First Amendment right to use the library; (2) Rowell has a Fourteenth Amendment liberty interest in his right to use the Library; and (3) Rowell has an enforceable property interest in his right to use the Library and thus did not receive procedural due process under the Fourteenth Amendment.[7]  Osborne failed to address any of these arguments in her reply brief.

### i.  First Amendment Right to Use Library

According to Rowell, he has a First Amendment right to use the Library because the Constitution protects the right to receive information and ideas and, to that end, the library is a place where citizens can exercise that right.  (Pls.' Resp. 9).  For that reason, Rowell argues that Osborne deprived him of this alleged fundamental right when she banned him from the Library permanently.  (*Id.*).

The court must first determine the existence and extent of such a right. *Brinkmeier v. City of Freeport*, No. 93-C-20039, 1993 WL 248201, at *3 (N.D. Ill. July 2, 1993).  Whether there is a first amendment right to access a public library has not been addressed by the Seventh Circuit.  In contrast, the Third Circuit extensively examined this issue and concluded that the First Amendment "includes the right to some level of

---

[7] As an initial matter, since these arguments do not appear to respond to Rowell's due process claim under the Fifth Amendment, the court must determine whether these arguments concern claims previously alleged in the Complaint.  This is because "in his response to the motion to dismiss, a plaintiff may assert additional facts to clarify an existing claim, but he may not amend (that is, correct or alter) his complaint such that he essentially asserts a new claim."  *Jones v. Sabis Educ. Sys., Inc.*, No. 98-C-4252, 1999 WL 1206955, at *3 (N.D. Ill. Dec. 13, 1999).  Here, for the purposes of this motion, the court liberally construes Plaintiffs' Complaint to include the claims argued.

access to a public library." *Kreimer v. Bureau of Police for Town of Morristown*, 958,

F.2d 1242, 1255 (3d Cir. 1992).  The court agrees with the Third Circuit's reasoning and

conclusion and finds that there is a First Amendment right to access the Library.

That, however, does not end the inquiry, as "the right to receive information is not

unfettered and may give way to significant countervailing interests." *Id.* at 1255.  Indeed,

a library is a limited public forum and is thus "obligated only to permit the public to

exercise rights that are consistent with the nature of the Library and consistent with the

government's intent in designating the library as a public forum." *Id.* at 1262.  Osborne

failed to respond to this argument, so the court cannot determine (1) whether she acted

pursuant to any Library policies – written or unwritten – and (2) whether such limitations

on Rowell's right to access and use of the Library pass constitutional muster.  *See, e.g.,*

*Kreimer*, 958 F.2d at 1263 (finding rule prohibiting behavior that harasses or annoys

others is fundamentally reasonable and did not violate First Amendment); *Brinkmeier*

1993 WL 248201, at *6 (holding unwritten policy to preclude those that harass or

intimidate library patrons was an unreasonable limitation on plaintiff's First Amendment

right to access); *Armstrong v. Dist. of Columbia Pub. Library*, 154 F. Supp. 2d 67, 79

(D.D.C. 2001) (finding regulation instructing library personnel to deny access to patrons

with "objectionable appearance" was vague and overbroad, and thus failed to satisfy First

Amendment standards).  Accordingly, Rowell's First Amendment claim concerning his

right to use the Library remains.

**ii.  Fourteenth Amendment Liberty Interest**

21

Next, Rowell argues that use of the library is (1) among the "common occupations of life"; (2) directly related to the right "to acquire useful knowledge"; and (3) one of the "privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (Pls.' Resp. 9). Rowell does not provide any authority that use of the library is indeed a liberty interest protected by the Fourteenth Amendment nor is the court aware of any. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (noting "it is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver") (citation omitted). Even assuming Rowell does have a liberty interest under the Fourteenth Amendment, as discussed above, Osborne's conduct toward Rowell does not "shock the conscience," and thus, Rowell cannot sustain a claim for a liberty interest under the Fourteenth Amendment to use the library.

### iii.  Enforceable Property Interest/ Fourteenth Amendment Procedural Due Process

Lastly, Rowell argues that he has an enforceable property interest in his right to use the Library, and this interest was taken away without "the most basic procedural due process guarantees required by the Fourteenth Amendment."

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1. Simply put, "the Fourteenth Amendment's Due Process Clause affords state citizens with the right to notice and an opportunity to be heard before being deprived of 'property' as defined by state law." *Taake v. Cnty. of*

*Monroe*, 530 F.3d 538, 543 (7th Cir. 2008).  Thus, in examining a procedural due process

claim, the court performs a two-step inquiry: (1) whether the defendant deprived the

plaintiff of a constitutionally protected liberty or property interest; and (2) if so, whether

that deprivation occurred without due process of law.  *Doe v. Heck*, 327 F.3d 492, 526

(7th Cir. 2003) (citation omitted).

The court begins by identifying the underlying interest allegedly deprived by the

state actor.  "To claim a property interest protected by the Fourteenth Amendment, a

person must have more than a unilateral expectation of the claimed interest.  He must,

instead, have a legitimate claim of entitlement to it."  *Khan v. Bland*, 630 F.3d 519, 527

(7th Cir. 2010) (internal quotation marks and punctuation omitted) (quoting *Bd. of*

*Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Indeed, a legitimate claim of

entitlement is "defined by existing rules or understandings that stem from an independent

source such as state law . . . ."  *Roth*, 408 U.S. at 577; *see also Stone v. Hope, IN,* No. 01-

0058-C-T/K, 2002 WL 663468, at *2 (S.D. Ind. Mar. 7, 2002) ("In order for there to be a

property interest, the interest must be created by independent sources that secure certain

benefits and that support claims of entitlement to those benefits").  Put another way, a

"property interest of constitutional magnitude exists only when the state's discretion is

'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific

conditions are met.'"  *Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 729 (7th

Cir. 2006).

Here, Rowell argues that he has an enforceable property interest in his right to use

the Library.  Rowell has not, however, pointed to any state law, contract, or another

independent source that guarantees him access to the Library under all conditions.

Rowell instead relies extensively on an Eleventh Circuit case, *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011), arguing that his enforceable property interest is "virtually identical" to the interest at stake in *Catron*.

     *Catron* is inapplicable for several reasons.  The Court in *Catron* held that homeless individuals had a "protected *liberty interest* to be in parks or on other city lands of their choosing that are open to the public generally."  658 F.3d at 1266 (emphasis added).  It is clear by that language alone that the *liberty interest* in *Catron* is not virtually identical to the *property interest* asserted here by Rowell.  Moreover, the type of public forum discussed in *Catron* – and the subsequent level of First Amendment protection – differs from the facts here.  Plaintiffs there alleged that the City prohibited them from "being in city parks . . . , on public sidewalks, and at bus shelters located on public sidewalks . . . ."  *Id.*  This contrasts sharply to the First Amendment protections found at a public library, which courts have characterized as a "designated public forum" or "limited public forum" for First Amendment purposes.  *Kreimer*, 958 F.2d at 1259 (stating "[i]t is clear . . . that a public library . . . is sufficiently dissimilar to a public park, sidewalk or street that it cannot reasonably be deemed to constitute a traditional public forum").  Thus, these interests are not similar, and as a result, *Catron* does not provide guidance here.

     Even more, *Catron* noted that the right to use city parks was not absolute, as residents did not have a constitutional right to use public parks under all conditions and at all times.  658 F.3d at 1267 n. 5.  Thus, even assuming the liberty interest at stake in

*Catron* had any similarity to the alleged property interest here, the exception noted in that case is precisely what is at issue here.

Aside from *Catron*, Rowell simply states that he has an enforceable property interest in his right to use the Library without citing any authority.  *Contra Moore v. Wisconsin Dep't of Admin.*, No. 11-cv-304, 2011 WL 1897772, at *2 (W.D. Wis. May 18, 2011) (dismissing procedural due process claim under Fourteenth Amendment where plaintiff had his library privileges suspended because plaintiff's allegations did not suggest he had any property interest in gaining access to library).  This is not sufficient to state a claim.  Because Rowell has not shown he has been deprived of a valid property interest, the court need not address what process, if any, was due.  Accordingly, Rowell's procedural due process claim under the Fourteenth Amendment is dismissed.

## B.        State Claims

Plaintiffs bring a claim for IIED with respect to Mary Rihm against the Library and Osborne and Medley, in their official and individual capacities.[8]  (Compl. Count Five).  In the same way, Plaintiffs bring a claim for IIED with respect to Rowell against the Library and Osborne and Medley, in their individual capacities.  (Compl. Count Six).

Under Indiana law, to state a claim of IIED, a plaintiff must plead that a defendant: (1) engaged in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) caused; (4) severe emotional distress to another.  *Waldrip v. Waldrip*, 976 N.E. 2d 102, 117 (Ind. Ct. App. 2012).  Indeed, "[i]t is the intent to harm one emotionally

---

[8] The official capacity claim against Osborne in Count Five must also be dismissed as redundant pursuant to the same reasoning as the dismissed constitutional claims in Counts One and Two.

that constitutes the basis for the tort of an intentional infliction of emotional distress."
*Cullison v. Medley*, 570 NE.2d 27, 31 (Ind. 1991).  To that end, the requirements to prove
this tort are "rigorous."  *Creel v. I.C.E. & Associates, Inc.*, 771 N.E.2d 1276, 1282 (Ind.
Ct. App. 2002).

"What constitutes 'extreme and outrageous' conduct depends, in part, upon
prevailing cultural norms and values."  *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct.
App. 1999).  Moreover, under Indiana law, conduct is extreme and outrageous:

> only where the conduct has been so outrageous in character, and so extreme
> in degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to an average
> member of the community would arouse his resentment against the actor,
> and lead him to exclaim, 'Outrageous!'

*Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (quoting Restatement
(Second) of Torts § 46 cmt. d (1965)).  Thus, "liability clearly does not extend to mere
insults, indignities, threats, annoyances, petty oppressions, or other trivialities."
*Gable v. Curtis*, 673 N.E.2d 805, 810 (Ind. Ct. App. 1996) (citing Restatement (Second)
of Torts § 46 at 72-73).

### 1.  Rihm's IIED Claim

#### a.  Osborne

Rihm's IIED claim is set within the employment context, but in employment cases
"Indiana courts have been reluctant to award damages for intentional infliction of
emotional distress."  *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (S.D.
Ind. 1997); *see also Ellis v. CCA of Tenn., LLC*, No. 1:08-cv-254, 2010 WL 2605870, at

*8 (S.D. Ind. June 21, 2010) ("Indiana courts shy away from awarding damages on the

basis of [IIED] as an independent tort in employment cases").  More importantly, per the

factual allegations in the Complaint, the court may only conclude that Osborne

suspended, and ultimately terminated, Rihm due to her unprofessional behavior and

complaints from other employees.  Indeed, the complaint is devoid of any allegations of

Osborne's discriminatory animus.  As a result, Osborne's decision to terminate Rihm for

"failing to follow orders and unprofessional conduct" cannot be deemed extreme and

outrageous conduct under Indiana law.  *See e.g., Keri v. Bd. of Trustees of Purdue Univ*.,

458 F.3d 620, 650 (7th Cir. 2006) (finding that termination of professor for engaging in

inappropriate conduct with students did not constitute extreme and outrageous conduct

under Indiana law); *Ellis v. CCA of Tenn., LLC*, No. 1:08-cv-254, 2010 WL 2605870, at

*8 (S.D. Ind. June 21, 2010) (holding that under Indiana law even unwarranted

disciplinary actions do not constitute extreme and outrageous conduct); *Powdertech, Inc.

v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (holding the firing of a employee

pursuant to disciplinary process does not constitute extreme and outrageous conduct).

Accordingly, Plaintiffs' claim against Osborne for IIED of Rihm (Count Five) must be

dismissed.

### b.  Library

Plaintiffs do not state the theory in which they bring a claim for IIED against the

Library, but for the purposes of this motion, the court assumes it is under the theory of

respondeat superior liability.  As such, the court must evaluate the actions of the

Library's employees to determine whether their acts result in liability for the Library.  As

noted above, Osborne's actions were neither extreme nor outrageous, so the court must also evaluate whether the actions of Medley and other Library employees impart liability on the Library.

Because Medley's actions are included in this analysis, Plaintiffs have factual allegations displaying discriminatory animus which may rise to the level of extreme and outrageous conduct. Given the liberal notice pleading standard and the fact that Plaintiffs are not required to allege all facts that support their claim at this time, it is possible for Plaintiffs to prove a set of facts consistent with their complaint to satisfy the high bar set for IIED. *See, e.g. Bryant v. Troy Auto Parts Warehouse, Inc.*, No. IP 95-1654, 1997 WL 441288, at *7 (S.D. Ind. Apr. 25, 1997) (denying summary judgment on IIED claim where employee was verbally harassed by co-workers and his supervisor was a participant in the name-calling). As a result, dismissal is inappropriate. *See Sullen v. Midwest ISO*, No. 1:04-cv-0914, 2005 WL 4889257, at *4 (S.D. Ind. July 27, 2005) (denying motion to dismiss IIED claim but noting it is "dubious that the Plaintiff will be able to meet the high bar set by Indiana law").

### 2. Rowell's IIED Claim

#### a. Osborne

Much like Rihm's IIED claim, Rowell's IIED claim is based scantly on Osborne's behavior. Again, no factual basis has been set forth to infer any discriminatory animus on the part of Osborne towards Rowell, and Plaintiffs' argument containing pure speculation of what motivated Osborne is not sufficient to state a claim. Accordingly,

Plaintiffs' IIED claim against Osborne with respect to Rowell (Count Six) must be dismissed.

### b.  Library

Finally, much like Rihm's IIED claim, the court considers Rowell's claim for IIED against the Library on a respondeat superior theory.  Again, when considering the allegations concerning all Library employees and all reasonable inferences stemming from such conduct, it is plausible that Plaintiffs may prove a set of facts consistent with their complaint to state a claim for IIED.  Accordingly, Plaintiffs' claim for IIED against the Library (Count Six) should not be dismissed.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion to dismiss (Docket # 16) is **GRANTED IN PART and DENIED IN PART**.  Plaintiffs' IIED claims against the Library survive as well as Rowell's First Amendment claim against Osborne.  All constitutional claims against the Library and Osborne in her official capacity are dismissed.  In addition, all remaining claims against Osborne in her individual capacity are dismissed.

**SO ORDERED** this 20th day of June 2013.

_____

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.